840 F.2d 1087
 61 A.F.T.R.2d 88-670, 88-1 USTC P 9201
 ST. GERMAN OF ALASKA EASTERN ORTHODOX CATHOLIC CHURCH, St.
John of Rila Eastern Orthodox Monastery, Vatna Realty
Corporation, Titchfield Realty Corporation, Glastonbury
Estates, Inc., Kotel Realty Corporation, Knutsford Realty
Corporation, Batin Realty Corporation, Vidin Realty
Corporation and Graystoke Realty Corporation, Petitioners-Appellants,
v.
UNITED STATES of America, Respondent-Appellee.
 No. 1375, Docket 87-6053.
 United States Court of Appeals,
Second Circuit.
 Argued June 9, 1987.
Decided Feb. 24, 1988.
 
 Ralph A. Jacobs, Philadelphia, Pa., (Marc S. Raspanti, Hoyle, Morris & Kerr, Philadelphia, Pa., of counsel), for petitioners-appellants.
 Peter J. Kurshan, New York City (Herzfeld & Rubin, P.C., New York City, of counsel), for petitioners-appellants.
 Mary Anne Wirth, Asst. U.S. Atty. S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., Nancy Kilson, Asst. U.S. Atty., New York City, of counsel), for respondent-appellee.
 Before VAN GRAAFEILAND, KEARSE and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 This is a consolidated appeal from an order of the United States District Court for the Southern District of New York, 653 F.Supp. 1342, Edward Weinfeld, Judge, entered on February 13, 1987 that denied petitioners' motions to quash five Internal Revenue Service ("IRS") third-party recordkeeper summonses served on various attorneys, for limited discovery, and to strike certain government exhibits as scandalous, immaterial and impertinent.[1]
 
 
 2
 We affirm.
 
 Background
 
 3
 Petitioners are St. German of Alaska Eastern Orthodox Catholic Church ("St. German"), St. John of Rila Eastern Orthodox Monastery ("St. John"), and subsidiary real estate holding corporations: Vatna Realty Corp., Titchfield Realty Corp., Glastonbury Estates, Inc., Kotel Realty Corp., Knutsford Realty Corp., Batin Realty Corp., Vidin Realty Corp., and Graystoke Realty Corp.
 
 
 4
 This case concerns five summonses, issued in connection with an IRS investigation into the affairs of Paul W.V. Ischie, Right Reverend Archimandrite of St. German and Abbot of St. John. The purpose of the investigation was to ascertain Ischie's income tax liabilities for the period from 1980 to 1984, during which years he allegedly filed no federal personal income tax returns, and to determine whether he had committed any offenses under the Internal Revenue Code. The government has maintained throughout the course of these proceedings that petitioners are not the targets of any investigation, civil or criminal, and has reasserted that contention on appeal.
 
 
 5
 An investigation conducted by IRS Special Agent John Kees led him to believe that Ischie might have orchestrated a number of transactions in which he solicited the donation of depressed realty to St. German and St. John at grossly inflated values--corresponding charitable deductions then being taken by the donor--which properties were thereafter sold at substantially lower prices.[2] Advertisements displaying St. German's telephone number which were placed in Fortune, and apparently also in the Wall Street Journal and New York Times, stated: "HARD TO SELL, DISTRESSED AND OTHER REAL ESTATE ACCEPTED BY RELIGIOUS CORPORATION. WILL STRUCTURE CONTRIBUTION OF REAL ESTATE TO MEET NEED OF DONOR."
 
 
 6
 The government sets forth five examples of such transactions in its brief: (1) property appraised upon contribution at $2.3 million sold by St. John for $250,000; (2) St. German sold property originally appraised at $622,500 for $50,000; (3) property initially appraised at $42,500 sold by St. German for $12,500; (4) St. German disposed of property originally appraised at $580,000 for $50,000; and (5) St. German sold property initially appraised at $34,100 for $8,000. There was evidence of numerous other donations and sales of real estate in which St. German and St. John played a similar role.
 
 
 7
 In at least three situations, one William Blackmore acted as appraiser for both donor and donee, appraising realty for the donor at the time of the donation and for St. German when it disposed of the property. On one occasion, Blackmore appraised property as of December 8, 1980 for its donor at $42,500; he appraised the same property as of July 26, 1982 for St. German at $12,240. In September, 1982, St. German sold the property for $12,500. On another occasion, Blackmore appraised property as of December 21, 1980 for its donor at $905,250, and for Ischie as of June 23, 1981 at $98,500; St. German sold it for $104,964.80 on July 6, 1981. On a third occasion, property was transferred to St. German in consideration of ten dollars. Blackmore appraised the realty for the transferor as of April 10, 1980 at $580,000. He appraised the same property for Ischie as of July 5, 1980 at $47,775. Since 1979, Blackmore has conducted approximately thirty appraisals for Ischie and his churches, and Ischie has often recommended Blackmore's services to potential donors.
 
 
 8
 While engaged in an investigation of Michael I. and Paul N. Gordon, Kees interviewed Ischie on March 8, 1985. At that time, Kees was investigating the Gordons, not Ischie or any of the petitioners. Prior to that interview, Kees also was aware that the Gordons had donated to St. German the capital stock of Herkimer Holding Corporation, the sole asset of which was a vacant building in Herkimer, New York. Kees also was aware that Blackmore had appraised the property for the donors at $622,500, and that St. German had subsequently sold it for $50,000. The property had been independently appraised for the IRS, as Kees knew, at approximately $50,000.
 
 
 9
 During the interview, Kees was informed that Michael Gordon had telephoned Ischie in 1980 in response to one of Ischie's advertisements. Gordon indicated his interest in donating his Herkimer, New York property. Ischie traveled to Herkimer to examine it. Gordon asked Ischie for the name of a real estate appraiser, and Ischie referred Gordon to Blackmore, who was located in Hempstead, New York. Ischie did not find it unusual that Gordon, an upstate New York real estate developer, requested that Ischie, a resident of Setauket, New York, suggest an appraiser. Ischie did not recall seeing the appraisal which Blackmore did for the Gordons, and Ischie further stated that he was never aware of the donated property's value. Ischie ultimately sold the Herkimer property to KSI Corp. for $50,000.
 
 
 10
 Kees also asked Ischie for general background information concerning Ischie and his church. Kees recalls that he "probably" asked Ischie about the church's procedure in accepting donations. Kees inquired whether Ischie required potential donors to complete any paperwork, and whether Ischie found it unusual that people not of his faith would be donating property to his church.
 
 
 11
 Since Ischie indicated he had no knowledge of the value of the Herkimer property stated in Blackmore's appraisal, Kees asked about the accounting procedure followed to record assets owned by Ischie's church. Ischie replied that he kept a list of owned properties which noted their locations but not their values. Kees questioned Ischie about the sale of the Herkimer property to KSI Corp., "probably" asking why the property was sold, whether it was listed with any brokers, and the names of any such brokers. Kees asked Ischie whether he was present at the closing with KSI Corp. In an effort to ascertain who derived monetary benefit from the Gordons' donation, Kees asked for the names of the authorized signatories on the St. German bank account, in which the proceeds of the Herkimer sale were deposited. In another attempt to determine the value of the Herkimer property, Kees asked whether Ischie had obtained insurance thereon following its donation. Kees "probably" inquired whether Ischie was a licensed real estate broker.
 
 
 12
 Kees noted that throughout the interview, Ischie "had been vague and appeared to be withholding information.... This along with his demeanor lead [sic] me to suspect his credibility. Therefore, I asked the taxpayer whether he used any aliases or had an arrest record."
 
 
 13
 Allan Greenstein, St. German's counsel, was present at Kees' interview of Ischie. Greenstein's recollection of what transpired at the interview does not depart in any material respect from that of Kees, but Greenstein characterizes the tone of the meeting differently. According to Greenstein, in June or July, 1984, he learned that the IRS had served a summons on St. German in connection with the agency's investigation of the Gordons. It was decided that the church should cooperate with the IRS based on the latter's "representations" that its investigation was limited to the affairs of one donor and was not a full-scale inquiry into St. German and its activities. Accordingly, various documents relevant to the Gordon transaction were furnished in response to an IRS request therefor. Later, Greenstein permitted Ischie to participate in the interview with Kees, based on the latter's assurance that he was not investigating the church or Ischie, but only the Gordons. Although Greenstein's recollection of what was asked at the interview largely corresponds with that of Kees, Greenstein suggests impropriety in that the scope of Kees' questions ventured far afield of the Gordons and their Herkimer property.
 
 
 14
 On July 18, 1985, Kees interviewed Elaine F. Kaldor, St. German's accountant. In response to Kees' inquiry, Kaldor generally described the services she performed for St. German. According to Kaldor, Kees asked a series of questions about St. German's religious activities, and did not clarify whether the church itself was under suspicion. When she asked what Kees was looking for, he allegedly replied: "Everything including the kitchen sink." Kaldor states that Kees asked whether St. German actually conducted religious services, what kind of services were held, and how often they were conducted. Kees asked whether the church had any members, whether they attended services, and how many did so. Kees further inquired whether Ischie participated in the services, and whether he was receiving income from the operation of the church.
 
 
 15
 Kees then probed, in Kaldor's view, into the "legitimacy" of the church. According to Kaldor, Kees seemed surprised when she reported that she had not filed income tax returns on behalf of St. German. Kaldor replied, "The returns for a church ?" Kees responded, "What if it's not a church?" Kees does not recall putting that question to Kaldor.
 
 
 16
 Based on the foregoing, the IRS has been led to believe that Ischie:
 
 
 17
 may have aided and abetted the preparation of false income tax returns filed on behalf of the donors of the[ ] distressed properties or may have conspired with other individuals to impede the administration of the income tax laws regarding charitable deductions; the taxpayer's [Ischie's] real estate corporations may have earned unreported taxable income through their business activities over the period at issue; Ischie himself may have derived unreported personal income from the donations of distressed properties which may be taxable income; and he may have knowingly and willfully failed to file income tax returns and attempted to evade the payment of income taxes.
 
 
 18
 Brief for Respondent-Appellee, p. 6.
 
 
 19
 Accordingly, from May to November, 1985, the IRS served five third-party recordkeeper summonses, pursuant to 26 U.S.C.A. Sec. 7609 (West Supp.1987), on various attorneys which required production of all records and documents in the attorneys' possession containing information relevant to any real estate or other transactions conducted for Ischie, St. German, St. John and their real estate corporations through the years 1980 to 1984. All but one of the summonses were served upon counsel for the church. The other summons was served upon Dominick Massaro, Esq., counsel for the donors in one real estate transaction.
 
 
 20
 Petitioners moved to quash the summonses, claiming, in each case, inter alia, that the summonses violate their first and fifth amendment rights, and that they improperly evade the restrictions on church tax inquiries set forth in 26 U.S.C.A. Sec. 7611 (West Supp.1987). The government moved to dismiss each of the petitions to quash, and to enforce the summonses. Petitioners cross-moved for discovery. The five proceedings were consolidated pursuant to Fed.R.Civ.P. 42(a). In an opinion and order reported at 653 F.Supp. 1342 (S.D.N.Y.1987), the district court denied petitioners' motions to quash the summonses. By stipulation of the parties, the order of the district court denying the motion to quash (and thus, in effect, enforcing the summonses) is stayed pending disposition of this appeal.
 
 
 21
 Petitioners appeal, contending that (1) the district court erred in denying their motion to quash the summonses without an evidentiary hearing, in light of their substantial showing of impairment of first amendment rights of free exercise of religion and freedom of association, and (2) the summonses should be quashed as part of a discriminatory criminal investigation, in violation of their fifth amendment rights to due process and equal protection.
 
 Discussion
 
 22
 In United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), the Supreme Court refused to require the Commissioner of Internal Revenue to satisfy a standard of probable cause in seeking enforcement of an IRS summons. It must be shown, however, that the investigation will be conducted pursuant to a legitimate purpose; that the inquiry may be relevant to that purpose; that the information sought is not already within the Commissioner's possession; and that the administrative steps required by the Internal Revenue Code have been followed.[3] Id. at 57-58, 85 S.Ct. at 254-55. The declarations of Agent Kees submitted in support of the government's position meet the requirements of Powell ; the IRS, therefore, is prima facie entitled to enforcement.
 
 
 23
 The IRS enjoys broad summons power. See United States v. Arthur Young & Co., 465 U.S. 805, 815-17, 104 S.Ct. 1495, 1501-03, 79 L.Ed.2d 826 (1984). The Supreme Court has noted that the investigatory authority of the IRS is "essential to our self-reporting system, and the alternatives could well involve far less agreeable invasions of house, business, and records." United States v. Bisceglia, 420 U.S. 141, 146, 95 S.Ct. 915, 919, 43 L.Ed.2d 88 (1975). Further, the Supreme Court "has consistently construed congressional intent to require that if the summons authority claimed is necessary for the effective performance of congressionally imposed responsibilities to enforce the tax Code, that authority should be upheld absent express statutory prohibition or substantial countervailing policies." United States v. Euge, 444 U.S. 707, 711, 100 S.Ct. 874, 878, 63 L.Ed.2d 141 (1980). See also United States v. First Bank, 737 F.2d 269, 273 (2d Cir.1984).
 
 
 24
 Of course, a constitutional challenge to an IRS summons may raise a "substantial countervailing policy" sufficient to counsel quashal of the summons under scrutiny. The question before us is whether petitioners have carried their burden of raising such a constitutional challenge, or of demonstrating bad faith, improper purpose, or other abuse of process on the part of respondent. See United States v. Powell, 379 U.S. at 58, 85 S.Ct. at 255 (court may inquire into underlying reasons for summons where process has been issued for an improper purpose, such as to harass the taxpayer, pressure him to settle a collateral dispute, or for any other bad faith purpose; burden on taxpayer to make requisite showing); United States v. Millman, 765 F.2d 27, 29 (2d Cir.1985) (per curiam) (where taxpayer makes "substantial preliminary showing" of abuse, he is entitled to an evidentiary hearing at which he may examine investigating agents or any other witnesses he may call). For the reasons discussed below, we conclude that petitioners have not made such a showing.
 
 
 25
 A. The Free Exercise/Free Association Claims.
 
 
 26
 The essence of petitioners' first amendment argument is that enforcement of the summonses involved here will lead to disclosure of the names of donors who have contributed realty to St. German and St. John, thereby (1) burdening some donors' free exercise of religion and freedom of association, and (2) discouraging donations and consequently infringing the free exercise and associational rights of the church, monastery, and church members and donors.
 
 
 27
 We will assume, as did the district court, that all petitioners have standing to raise the constitutional claims here advanced, inasmuch as St. German has standing to represent the interests of its members and contributors. See NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 458-59, 78 S.Ct. 1163, 1169-70, 2 L.Ed.2d 1488 (1958) (nonprofit corporation may raise free association claims on behalf of its members); Buckley v. Valeo, 424 U.S. 1, 11-12 & n. 10, 96 S.Ct. 612, 631 & n. 10, 46 L.Ed.2d 659 (1976) (per curiam) (plaintiffs, including various political organizations, may raise first amendment rights of contributors); Local 1814, Int'l Longshoremen's Assoc. v. Waterfront Comm'n, 667 F.2d 267, 270 (2d Cir.1981) (political action fund may raise first amendment claims of contributors).
 
 
 28
 A valid free exercise claim contemplates a showing that governmental action of some sort burdens the exercise of one's religion. If a burden is shown, that action will be upheld only upon demonstration that a compelling governmental interest warrants the burden, and that less restrictive means to achieve the government's ends are not available. Brandon v. Board of Education, 635 F.2d 971, 976 (2d Cir.1980) (citing, inter alia, Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)), cert. denied, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981).
 
 
 29
 Petitioners' free exercise claim is that enforcement of the summonses has dissuaded, and will continue to dissuade, contributors from donating realty to St. German, thereby infringing their first amendment rights. Further, they urge, since St. German depends upon charitable contributions, a halt in donations would threaten the church's very existence, thereby violating the first amendment rights of its members.
 
 
 30
 We accept Ischie's statements that St. German is dependent on charitable contributions, and that many donors prefer that their dealings with the church be kept confidential. His statements, however, that "[r]epeat donations have come to a standstill"; that one donor "has asked that he no longer be used as a reference" because "he was contacted by the media and ... greatly embarrassed"; that "[s]ome donors, after seeing publicity, have ... reversed earlier decisions to make a donation"; and that since the IRS began its investigation, St. German "has had a significant drop in the number of contributions", do not establish that the IRS investigation is the cause of these problems. This is particularly so in view of the fact that--as Ischie himself admitted--due to the severe financial difficulties suffered by St. German prior to its solicitation of realty donations, the church "was subjected to harsh and often unjustified and unfair publicity in the local newspapers and community."
 
 
 31
 Even assuming, however, that the IRS investigation has dissuaded some donors from contributing property to St. German, due to their fears that their names will be publicized or they will face potential investigation by the IRS, the district court quite correctly pointed out that "the claimed impact on free exercise is incidental; contribution to the church is not forbidden, and the summons[es] do[ ] not directly impinge upon any practice central to the religious beliefs of church contributors or members." 653 F.Supp. at 1346 (footnote omitted). To the extent that some donors may be dissuaded from donating property appraised at unjustifiably inflated values and from taking corresponding charitable deductions, we need simply note that such action, even if motivated by the donors' religious convictions, is not thereby immunized from governmental investigation. See Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963).
 
 
 32
 Furthermore, any incidental burden on the free exercise rights of the church, its members and contributors which may fairly be gleaned from the record must be balanced against the government's interest in enforcing the summonses. That interest is undeniably strong. See, e.g., United States v. Grayson County State Bank, 656 F.2d 1070, 1074 (5th Cir.1981) (government has substantial interest in maintaining the integrity of its fiscal policies), cert. denied, 455 U.S. 920, 102 S.Ct. 1276, 71 L.Ed.2d 460 (1982); United States v. Holmes, 614 F.2d 985, 990 (5th Cir.1980) (per curiam) (same); United States v. Egan, 459 F.2d 997, 998 (2d Cir.) (per curiam) (same), cert. denied, 409 U.S. 875, 93 S.Ct. 123, 34 L.Ed.2d 127 (1972).
 
 
 33
 Nor do we agree with petitioners' claim that the district court failed to consider whether enforcement of the summonses at issue here is the least restrictive available means to accomplish the government's objectives. The record contains evidence of several instances of questionable real estate transactions, each apparently orchestrated by Ischie. The district court found that the records called for by the summonses are relevant to the IRS's inquiry as to whether Ischie assisted others in evading the tax laws. Further, the court found that the IRS was unlikely to find the information it needed in Ischie's personal records. Given the evidence of record that Ischie has no personal savings or checking accounts, no certificates of deposit, no stock, no cash or personal property, and that in his interview with Agent Kees, Ischie could not recall seeing an appraisal of certain donated property or writing a letter acknowledging a donation, the court's finding was perfectly reasonable. The foregoing, taken together with the fact that the IRS does not maintain files on charitable contributions by the names of the donees, indicates that the government may not attain its purpose by means which do not impose the burden--to the extent one exists--involved here.
 
 
 34
 Petitioners' free association claim fares no better. In general, the first amendment shields a person's freedom "to engage in association for the advancement of beliefs and ideas.... whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters." NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958). Governmental action which may operate to restrict the freedom to associate is subject to exacting scrutiny. Id. at 460-61, 78 S.Ct. at 1170-71; Buckley v. Valeo, 424 U.S. 1, 64-65, 96 S.Ct. 612, 656-57, 46 L.Ed.2d 659 (1976); Local 1814, Int'l Longshoremen's Assoc. v. Waterfront Comm'n, 667 F.2d 267, 270 (2d Cir.1981). Enforcement of the IRS summonses involved here, which the government concedes could cause disclosure of contributors' names, should not be ordered unless it is substantially related to a compelling governmental interest. Buckley v. Valeo, 424 U.S. at 64, 96 S.Ct. at 656.
 
 
 35
 As we have noted above, however, in agreement with the court below, a compelling governmental interest exists here--that of enforcement of the tax laws. Disclosure of records relating to donative real estate transactions conducted on behalf of St. German is substantially related to the IRS's investigation of Ischie, especially given the evidence of alleged wrongdoing detailed by Agent Kees. Nor does it appear that the IRS's investigative goals can be achieved through less burdensome means, for the reasons heretofore discussed. We conclude that the challenged summonses present no violation of constitutional rights of free association.
 
 
 36
 The cases cited by petitioners do not require a different result. In Baldwin v. Commissioner, 648 F.2d 483 (8th Cir.1981), and United States v. Citizens State Bank, 612 F.2d 1091 (8th Cir.1980), the Eighth Circuit found error where an IRS summons was enforced below without adequate consideration of the taxpayer's first amendment claims. Grandbouche v. United States (In re First National Bank), 701 F.2d 115 (10th Cir.1983), involved a refusal to consider such claims on standing grounds; the Tenth Circuit reversed and remanded for an evidentiary hearing. And in United States v. Church of World Peace, 775 F.2d 265 (10th Cir.1985), a church whose membership list was sought asserted that each of its members known to the IRS had been the target of an audit, and that additional names sought via the summons before the Tenth Circuit were requested for the same purpose; when the government made no response, the court refused to require the church to turn over its membership list to the IRS.
 
 
 37
 In this case, the district court was clearly aware of, and applied the pertinent law; it carefully evaluated petitioners' first amendment claims, and balanced them against the government's showing of need for the requested real estate records. The district court then concluded that the government had made an adequate case for enforcement, and petitioners had not made a substantial preliminary showing of abuse adequate to require an evidentiary hearing. There was no error or abuse of discretion in Judge Weinfeld's typically painstaking and thorough consideration of these questions.
 
 
 38
 B. The Discriminatory Investigation Claim.
 
 
 39
 It is next claimed that the church and monastery are being singled out for investigation in violation of the due process and equal protection guarantees of the fifth amendment. We will assume, as did the district court, that petitioners' discriminatory investigation claim is subject to the same test as a discriminatory prosecution claim. See Karme v. Commissioner, 673 F.2d 1062, 1064 (9th Cir.1982). Accordingly, the person asserting such a claim bears the burden of establishing, prima facie, both:
 
 
 40
 (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for [investigation], and (2) that the government's discriminatory selection of him for [investigation] has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.
 
 
 41
 United States v. Moon, 718 F.2d 1210, 1229 (2d Cir.1983) (quoting United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir.1974)), cert. denied, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). See Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) (successful selective prosecution claim contemplates showing that governmental action has discriminatory effect and is motivated by discriminatory purpose). No evidentiary hearing or discovery is required unless the district court, in the exercise of its discretion, finds that the required prima facie showing has been made as to both elements of the test. Moon, 718 F.2d at 1229. Here, the record amply supports the district court's ruling that neither prong of the relevant test was met, and accordingly no evidentiary hearing was required.
 
 
 42
 Petitioners claim that the affidavits submitted below and made part of the record show "that a large and varied group of charitable and religious organizations solicit and accept donations of real estate in order to support their activities.... Furthermore, charitable entities often sell the property for prices that are below the value claimed by the donor...." Thus, it is claimed, since these other, "better-known" organizations have not been scrutinized by the IRS in the same way as have petitioners, petitioners have been unlawfully singled out.
 
 
 43
 For example, Thomas P. Benjamin, the Director of Administration for the National Society of Fund Raising Executives, submitted an affidavit stating that "[i]t is extremely common for charitable organizations including churches, institutions of higher education and hospitals to solicit the general public and accept gifts of appreciated property (including real estate), on a regular basis, and subsequently sell the property quite likely at below fair market value prices." Philip Converse, President of the Memphis Arts Council, and W. Dean Broome, Territorial Director of Planned Giving for The Salvation Army, provided similar affidavits.
 
 
 44
 These statements, standing alone, do not satisfy the first prong of the Moon test. As the government points out, none of the statements describes situations such as that at bar, where donated property was repeatedly sold at prices drastically below the appraised value at the time of donation, and where the donee advertised for distressed realty and frequently selected the appraiser for the donor.
 
 
 45
 Petitioners also point to United States v. Brigham Young Univ., 679 F.2d 1345 (10th Cir.1982), vacated and remanded, 459 U.S. 1095, 103 S.Ct. 713, 74 L.Ed.2d 944 (1983), in an effort to meet the first prong of the Moon test. There, the IRS audited the tax returns of 162 individual taxpayers who sought deductions for various charitable contributions to Brigham Young University. The IRS eventually disallowed roughly $16,000,000 of the $18,000,000 claimed on the taxpayers' returns, but did not conduct a criminal or civil investigation of the University or any of its officers or employees in connection with the overvalued deductions. Petitioners claim that since no criminal or civil[4] investigation was undertaken with respect to any officers or employees of Brigham Young University, the investigation of Ischie which the IRS is concededly conducting is discriminatory.
 
 
 46
 The Brigham Young case, however, furnishes us with no basis for concluding that Brigham Young University and petitioners are similarly situated. There is no showing that Brigham Young University actively solicited the donation of depressed realty, offered to structure donations to meet the needs of the contributors, or selected appraisers for its donors. In any event, we agree with the district court, see 653 F.Supp. at 1348-49, that a single instance of failure to investigate does not provide an adequate evidentiary basis for a conclusion of selective investigation.
 
 
 47
 Similarly, United States v. Hazel, 696 F.2d 473 (6th Cir.1983), is of no help to petitioners. There, defendants were convicted of income tax-related offenses, and raised a "colorable" claim that they had been singled out from others similarly situated where thirty-four other members of defendants' tax revolt group committed tax violations but did not face prosecution. No remotely similar facts are present here.
 
 
 48
 In any event, petitioners have failed to carry their burden of showing that the IRS's investigation of Ischie is motivated by "the desire to prevent [their] exercise of constitutional rights." United States v. Moon, 718 F.2d at 1229. There is only the most tenuous showing, based entirely upon petitioners' interpretation of certain comments by Kees during his interviews of Ischie and Kaldor, that Kees had any motivation to intrude improperly upon petitioners' first amendment rights, and no showing whatever that any alleged bias on Kees' part has become the IRS's institutional posture. See United States v. Millman, 822 F.2d 305, 307-09 (2d Cir.1987). Once again, therefore, Judge Weinfeld correctly concluded that the motion to quash should be denied and that no evidentiary hearing was required.
 
 Conclusion
 
 49
 The order of the district court is affirmed.
 
 
 
 [1]
 Only the denial of the motions to quash is before us on this appeal
 
 
 [2]
 At this preliminary stage, of course, the facts we recite herein are derived from affidavits provided by the parties. Our recital of those facts for purposes of this opinion obviously implies no conclusion on our part that they will ultimately be established at trial or otherwise. We note, however, that although they challenge the motives of the IRS, petitioners do not contest the factual details presented by the IRS with respect to the real estate transactions described herein
 
 
 [3]
 We reject petitioners' contention that the IRS was required, and failed, to comply with 26 U.S.C.A. Sec. 7611 (West Supp.1987). As the district court found, petitioners simply have not shown that the IRS's investigation is in fact directed at the church and monastery. We thus do not have here a "church tax inquiry" within the meaning of 26 U.S.C.A. Sec. 7611(h)(2) (West Supp.1987), so the IRS was not obligated to comply with the requirements of that section. Kerr v. United States, 801 F.2d 1162, 1164 (9th Cir.1986)
 
 
 [4]
 The district court opinion states that "there was a civil investigation" in the Brigham Young case, 653 F.Supp. at 1348, but the government subsequently advised this court that this finding is "correct only to the extent that it refers to an investigation to determine the names of additional donors, and not to the extent that it refers to a civil investigation of BYU."