Patrick ROBINSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 98–CM–106, 98–CO–694.

District of Columbia Court of Appeals.

Argued June 29, 2000.
Decided March 15, 2001.

Christopher Warnock, Washington, DC, appointed by the court, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth Trosman, and Whitney C. Ellerman, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, GLICKMAN and WASHINGTON, Associate Judges.

GLICKMAN, Associate Judge:

This is one of several pending appeals arising from criminal prosecutions in a special unit of the Superior Court established by the Chief Judge to hear domestic violence cases exclusively. The appeals raise the same issues: whether the Domestic Violence Unit, as it is called, was constituted in violation of law and was without "jurisdiction;" and whether unconstitutional discrimination against men in the prosecution of domestic violence crimes or other equal protection or due process violations tainted the ensuing convictions.

We hold that the Chief Judge of the Superior Court had the legal authority to create the Domestic Violence Unit, and that criminal cases properly may be assigned to that Unit. We further hold that the evidence presented in the instant case—which is comparable if not identical to the evidence presented in the other cases on appeal—does not show a violation of due process or equal protection. As no other claims of error warranting reversal

are asserted in the present case, we affirm the conviction now before us.

## I.

Appellant Patrick Robinson was charged with one count of simple assault, in violation of D.C.Code § 22–504 (1996). His case was assigned to the Domestic Violence Unit of the Superior Court.

At trial, Sergeant Wanda Fisher–Turner of the Metropolitan Police Department testified that she was driving on Southern Avenue when something hit the side of her car. She turned and saw a swerving white car that was being driven by a young woman later identified as Laura Payne, Robinson's girlfriend. Robinson was in the front passenger seat, and two or three passengers were in the rear seat. Fisher–Turner saw Robinson punch Payne, and Payne, who had taken her hands off the steering wheel, push and strike Robinson. Fisher–Turner pulled ahead, and the white car rammed her car from behind. Both vehicles stopped.

Robinson proceeded to get out, walk around to the driver's side, and forcibly drag Payne from the car. He then pushed her against the hood, choked her with both hands, and slapped her in the face as she screamed and tried to push him away. Fisher–Turner ordered Robinson to stop, but he just cursed at her. She called for police backup, and Robinson was arrested. Fisher–Turner testified that she arrested Robinson because she perceived him to be the aggressor in the struggle outside the vehicle. She stated that she did not know who started the altercation inside the car.

Testifying in his own defense, Robinson denied that he struck or choked Payne. The other occupants of the white car, including Payne herself, supported Robinson's denial of guilt. They testified that there had been no fighting, and that Sergeant Fisher–Turner approached their car, displayed her gun and arrested Robinson for no apparent reason. On cross-examination, Payne, who was eighteen years old and five months pregnant with Robinson's child, admitted that she hoped that Robinson would help support her and the baby.

The trial judge, the Honorable Wendell P. Gardner, Jr., found Robinson guilty of simple assault. Judge Gardner subsequently placed Robinson on probation, suspending the execution of a 180–day term of imprisonment and a $1,000 fine. As a condition of probation, Judge Gardner ordered Robinson to complete the Domestic Violence Intervention Program, a treatment program under the aegis of the probation office.

## II.

Prior to trial, Robinson sought leave to file a concededly untimely motion to dismiss the information against him on the ground that the Domestic Violence Unit was established in violation of law and lacked jurisdiction of his case. In addition, Robinson contended that the Unit deprived criminal defendants of due process and equal protection of the laws. Leave to file the late motion was denied, and Robinson's case was certified to trial.[1] Robinson thereafter moved to vacate his conviction pursuant to D.C.Code § 23–110 (1996). In that collateral attack, Robinson renewed his jurisdictional and constitutional claims, and expanded his equal protection claim to allege discrimination against men in the prosecution of domestic violence cases by

---

1. As it happens, Robinson's case was certified for trial before a judge (Judge Gardner) who was not himself assigned to the Domestic Violence Unit—a not infrequent occurrence in Superior Court, we are given to understand.

the police, and the United States Attorney, as well as by the Domestic Violence Unit.

Judge Gardner denied Robinson's § 23–110 motion without a hearing. Rejecting Robinson's claims on their merits, Judge Gardner concluded, first, that Robinson "fail[ed] to articulate any prejudice suffered" as a result of the assignment of his prosecution to the Domestic Violence Unit. Judge Gardner further concluded that the Unit was "a legitimate part of the Superior Court" and did not lack jurisdiction over Robinson's case, and that Robinson's due process and equal protection challenges were "unfounded."[2]

On appeal, Robinson reasserts his claims of lack of jurisdiction and constitutional violation. The government has responded to those claims on their merits, without asserting any procedural barriers, even though Robinson does not contend that the trial court erred when it rejected his pretrial motion to dismiss as untimely. Since the government has not invoked waiver or procedural default, or other restrictions specifically applicable to claims for relief under D.C.Code § 23–110, we decide the substantive issues that Robinson presents.

## A. Jurisdiction of the Domestic Violence Unit

Robinson contends that the Domestic Violence Unit lacks jurisdiction over his criminal case. He argues that the Unit is not authorized by law, and that the Chief Judge of the Superior Court exceeded his powers in creating it. We disagree with Robinson's thesis on all counts.

The Domestic Violence Unit was created in 1996 by administrative order of the Chief Judge of the Superior Court (then Chief Judge Eugene N. Hamilton). *See* Administrative Order ("A.O.") No. 96–25 (October 31, 1996). The Unit implemented a proposal contained in the District of Columbia Domestic Violence Plan of 1995, an interagency agreement on a program to combat domestic violence.[3] Responding to an upsurge in the number of domestic violence cases, both criminal and civil, being filed in Superior Court,[4] the Plan recommended a unified domestic violence court that would maximize the coordinated and efficient deployment of resources and expertise.[5] Pursuant to this recommenda-

---

2. Judge Gardner relied in large measure on an opinion by Judge Stephen Milliken rejecting an identical motion that was filed in another Superior Court case, *United States v. Castro*, No. M–3987–97 (D.C.Super.Ct. September 25, 1997).

3. The signatories to the Domestic Violence Plan included the Mayor, the Chief Judge of the Superior Court, the United States Attorney, the Corporation Counsel, the Chief of Police, the Director of the Pretrial Services Agency, and the representatives of numerous other public and private entities.

4. The increasing number of such filings was attributed, at least in part, to the enactment of the District of Columbia Prevention of Domestic Violence Amendment Act of 1990, codified at D.C.Code § 16–1031 (1997). That Act requires police officers to make an arrest whenever they have probable cause to believe that a person has committed an intrafamily offense causing physical injury or reasonable fear of imminent serious physical injury or death.

5. According to the Plan, a domestic violence court was proposed,

to promote specialization among judges, prosecutors, defense attorneys, and other system components; to encourage the handling of each case in the manner most appropriate to the individual circumstances of the case; to impose offender accountability through the imposition of a variety of sanctions including jail and jail treatment, in appropriate cases, and monitored treatment programs for those offenders who enter the system early in the cycle of violence; to promote maximum allocation of scarce resources; and to provide judicial review and monitoring of each case, upon disposition, through a coordinated approach to ensure

tion, the Chief Judge established the Domestic Violence Unit which includes "judges and commissioners who will hear domestic violence cases exclusively; a dedicated unit within the Social Services Division of the Court, which will assess, monitor, and treat domestic violence victims, offenders and members of their family who are referred by the Court; and the Domestic Violence Coordination Unit [DVCU] within the Office of Clerk of the Superior Court, which will process these cases." A.O. No. 96–25.[6] The administrative order further provides that the following cases will be heard in the Domestic Violence Unit:

> all cases (except juvenile delinquency and abuse and neglect cases) involving an "intrafamily offense," as defined in D.C.Code § 16–1001(5); all criminal misdemeanors, where the defendant and victim have an intrafamily relationship as defined by D.C.Code § 16–1001(5)(A) [or] (B); and all divorce, custody, paternity and child support cases involving parties to cases in the above categories.

*Id.*[7] The order states that although these cases will be on the Domestic Violence Unit calendars, they "will be governed by the relevant Civil, Criminal, Family or Intrafamily rules of the Superior Court." *Id.*

■ As a preliminary matter, even if the creation of the Domestic Violence Unit was *ultra vires* as Robinson contends, the defect was not jurisdictional. The Superior Court had jurisdiction over Robinson's criminal case. *See* D.C.Code § 11–923(b)(1) (1995). However the Superior Court may be organized for administrative purposes into divisions, branches or other units, the Court is a unitary entity under the District of Columbia Court Reorganization Act of 1970.[8] The "functional divisions" of the Court "do not delimit their power as tribunals ... with general jurisdiction." *Andrade v. Jackson*, 401 A.2d 990, 992 (D.C.1979). *Accord, Clay v. Faison*, 583 A.2d 1388, 1390 (D.C.1990); *Ali Baba Co. v. WILCO, Inc.*, 482 A.2d 418, 425–26 (D.C.1984). A case over which the Superior Court has jurisdiction is not subject to dismissal, therefore, merely because it is assigned to a unit of the court in which it does not belong. Rather, at most

---

that the judge who has the best understanding of the history of violence between the involved parties will monitor the case.
DOMESTIC VIOLENCE COORDINATING COUNCIL, DISTRICT OF COLUMBIA DOMESTIC VIOLENCE PLAN 8 (1995).

6. Judge Milliken's order in *Castro, supra*, note 2, observes that the Chief Judge determined that "a unified court structure [for domestic violence cases] would more efficiently utilize judicial resources and better serve the community by eliminating multiple judicial officers hearing related cases in the several divisions and issuing duplicative and potentially conflicting orders." *Castro, supra*, No. M–3987–97. As an example of the benefits from coordinated handling of domestic violence cases, A.O. No. 96–25 provides that at arraignment in all new domestic violence misdemeanor cases, the courtroom clerk will, as appropriate, serve the defendant with tempo-

rary protection orders, petitions for civil protection orders, paternity and child support petitions, and other related papers.

7. The term "intrafamily offense" is defined in D.C.Code § 16–1001(5) (1997) to mean:

> an act punishable as a criminal offense committed by an offender upon a person:
> (A) to whom the offender is related by blood, legal custody, marriage, having a child in common, or with whom the offender shares or has shared a mutual residence; or
> (B) with whom the offender maintains or maintained a romantic relationship not necessarily including a sexual relationship.

8. The Court Reorganization Act is Title I of the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473 (1970), and is codified at D.C.Code § 11–101 *et seq.* (1995).

"the appropriate remedy would be simply to transfer the case to the appropriate division [or branch or other unit] of the trial court." *Andrade*, 401 A.2d at 994.[9] Thus, even if the Domestic Violence Unit was established without statutory authority, that would mean only that—as a matter of internal court administration—Robinson's case should have been transferred formally to the Criminal Division of Superior Court and prosecuted there.

In Robinson's case, it is by no means clear that the failure to make such a transfer (which Robinson, who only sought dismissal, never requested) was in any way prejudicial. Robinson's prosecution in the Domestic Violence Unit was conducted in accordance with the Superior Court Rules of Criminal Procedure, the same as if his case had been prosecuted nominally in the Criminal Division. The same substantive law and the same rules of evidence were also applied. So far as we can tell (and setting aside Robinson's independent claims of constitutional error, which we address separately below), the locus of Robinson's case in the Domestic Violence Unit made no practical difference to the conduct of his trial or sentencing proceedings. We do not, however, deny relief on harmless error grounds, for the retention of Robinson's criminal prosecution in the Domestic Violence Unit was not error to begin with.[10]

The Chief Judge of the Superior Court issued the administrative order establishing the Domestic Violence Unit pursuant to his statutory authority to "arrange and divide the business of the Superior Court." D.C.Code § 11–906(b) (1995). The Chief Judge has broad discretion in deciding how to exercise this authority. "Predictably, the chief judge will divide the business of the superior court as best comports with the fair and expeditious disposition of the court's business." Wesley S. Williams, Jr., *District of Columbia Court Reorganization, 1970*, 59 Geo. L.J. 477, 504 (1971). Centralizing cases involving domestic violence in a select group of judges and other court personnel in order to render justice and deliver coordinated services in a knowledgeable, efficient and comprehensive fashion is "arrang[ing] and divid[ing] the business of the Superior Court," namely, its domestic violence caseload. On its face, the decision to take such a step is well within the discretion that § 11–906(b) grants to the Chief Judge.

■ Robinson argues, however, that the Chief Judge did not exercise his discretion in a manner "consistent with" the Court Reorganization Act, as is required by D.C.Code § 11–906(b), because A.O. 96–25 did not place the Domestic Violence Unit within any particular division of the Superior Court. Robinson contends that the Unit therefore violates D.C.Code § 11–902 (1995), which states that the Superior Court "shall consist" of five divisions— Civil, Criminal, Family, Probate and Tax (which may themselves be divided into "such branches as the Superior Court may by rule prescribe").

This argument attributes a restrictiveness to the statute which we think is un-

---

9. Transfer is not necessarily mandated in all such cases. "This court has long held that there is no jurisdictional bar to one division of the Superior Court entertaining an action more appropriately considered in another division, so long as doing so does not violate the statute or rules of the court and the claim has a rational nexus to a subject mater within the responsibility of the division." *Clay*, 583 A.2d at 1390. *Accord, Ali Baba Co.*, 482 A.2d at 426.

10. For the same reason, we need not and do not decide this appeal under a plain error standard of review even though Robinson did not ask that his case be transferred prior to trial.

warranted. Congress did not intend to impose a straitjacket on the internal organization of the Superior Court when it enacted § 11–902 as part of the Court Reorganization Act. Rather, in creating a single Superior Court of general jurisdiction with five subject matter divisions, Congress was seeking by consolidation and unification to remedy the disarray of a court system in which jurisdiction over local matters was divided among three different local trial courts and the federal district court. *See Williams, supra,* at 501–503. "This dual court system with its concomitant statutory restrictions on the jurisdiction of the local courts ... was needlessly complicated and often inefficient, rendering it impossible for one tribunal to adjudicate all the claims of the parties in one action." *Andrade,* 401 A.2d at 992. "According to the drafters of the new legislation, the purpose of the [Court Reorganization] Act 'was to provide for ... the creation of a local, unified and modern court system for the District of Columbia,' ..., and 'to bring together those local courts which (did) exercise limited jurisdiction over local matters.' " *Id.* (quoting H.R.REP. No. 91–907 at 34 (1970)).

We are satisfied that A.O. No. 96–25 is "consistent with" the goals of the Reorganization Act, and specifically with § 11–902. There is no indication that in defining the five divisions of the Superior Court, Congress intended to preclude the creation of a court unit specializing in a subject matter that crosses division lines. The legislative intent was, rather, to replace the former courts of limited jurisdiction with a unified court of general jurisdiction. The assignment of Robinson's and other domestic violence cases to a single unit in order to facilitate coordination and enhance the delivery of services that might otherwise be performed by more than one division acting independently of each other furthers the objectives of the Reorganization Act. That individual judges (and other court personnel) who are assigned to the Domestic Violence Unit may have concurrent responsibility for different kinds of cases that are governed by the rules of different divisions, instead of responsibility for only one kind of case (e.g., criminal) at a time, is likewise consistent with Congress's aims in establishing a unified Superior Court. The assignment of responsibilities to judges "across divisions" does not threaten the divisional structure of the Court, for the Chief Judge could have accomplished the same thing by making joint appointments of judges to the Criminal, Family and Civil Divisions simultaneously for purposes of handling all the domestic violence cases arising in each of those divisions. *See* D.C.Code § 11–908 (1995) (Chief Judge "may assign and reassign any judge to sit in any division or branch").

The Chief Judge respected the existing divisional structure of the Court by specifically providing that cases in the Domestic Violence Unit would continue to be "governed" by the rules of the divisions in which those cases would otherwise be prosecuted.[11] On a case-by-case basis, the Domestic Violence Unit thus acts under A.O. 96–25 as though it were a section of whichever division would otherwise be nominally responsible.[12] For Robinson to

---

11. Subsequent to this appeal, and effective July 15, 2000, the Board of Judges of the Superior Court adopted Rules Governing Proceedings in the Domestic Violence Unit. SCR DV 1 specifically provides that "[c]riminal proceedings assigned to the Unit are governed by the Superior Court Rules of Criminal Procedure."

12. The Rules governing procedure in the Criminal and Family Divisions expressly provide that the Chief Judge may create such sections. *See* Super. Ct.Crim. R. 1(d) ("The

complain that even though his criminal case was governed by the rules of the Criminal Division, it was not *nominally* "in" that division, is to elevate form over substance.

■ Indeed, nothing in the Court Reorganization Act precludes the Chief Judge from assigning some criminal prosecutions outside the Criminal Division pursuant to his statutory authority under D.C.Code § 11–906(b) to "arrange and divide the business of the Superior Court." *See Williams, supra,* at 504. Robinson contends that the prosecution of his case in the Domestic Violence Unit was contrary to Super. Ct.Crim. R. 1(b)(2), which provides that misdemeanor criminal prosecutions "shall be conducted in the Misdemeanor Branch" of the Criminal Division. We construe this Rule to be substantially satisfied if misdemeanor prosecutions are conducted in the Domestic Violence Unit pursuant to the Criminal Rules, because the Unit thereby acts as a section of, and is functionally equivalent to, the Misdemeanor Branch in such cases. The Superior Court Board of Judges in effect ratified that construction of Super. Ct.Crim. R. 1 by its recent adoption of SCR–DV 1. *See* note 11, *supra.* The contrary construction that Robinson espouses would mean that Super. Ct.Crim. R. 1 imposes an absolute limitation not found in the Reorganization Act on the discretionary authority granted to the Chief Judge by D.C.Code § 11–906(b). Since rules for the Criminal Division must be "consistent with

any statute 'applicable to [the court's] business,'" *Flemming v. United States,* 546 A.2d 1001, 1005 (D.C.1988) (quoting D.C.Code § 16–701 (1981)), we are reluctant to construe Rule 1 to limit so drastically the statutory power of the Chief Judge in the area of one of his core responsibilities.

■ Robinson further contends that the assignment of certain divorce, custody, paternity and child support cases to the Domestic Violence Unit is explicitly proscribed by the Court Reorganization Act. D.C.Code § 11–1101 (1995) states that the Family Division "shall be assigned ... exclusive jurisdiction of" such cases.[13] This statutory provision does not benefit Robinson, however. His misdemeanor case is not within the "exclusive jurisdiction" of the Family Division. Whether or not the Chief Judge lacked statutory authority to assign other kinds of cases to the Domestic Violence Unit, he had such authority in the case of misdemeanors. That is all we need to determine to resolve Robinson's "jurisdictional" challenge in this case.

### B. Due Process of Law

Robinson argues that the Domestic Violence Unit deprives criminal defendants of due process of law. Stripped of hyperbole,[14] Robinson's complaint is that the Unit is structured so that the same judge presiding over a prosecution for an intrafamily offense (without a jury[15]) may also preside over other intrafamily matters involving the same parties, and be privy to

---

Chief Judge by order may create such Sections as may be necessary for the sound administration of justice."); Super Ct. Gen. Fam. R. A ("The Family Division shall be divided into such branches and sections as the Chief Judge shall direct.")

**13.** There is no comparable statutory provision vesting exclusive jurisdiction of any cases in the Criminal Division.

**14.** Robinson's brief claims that the "closest analogue to the Domestic Violence Unit is the English Court of Star Chamber," and that the Unit "represents an almost complete abolition of the common law system."

**15.** *See* D.C.Code § 16–705(b) (1997).

evidence in those matters that would be inadmissible in the criminal trial. This complaint does not state a violation of due process in Robinson's case.

 "In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." *Harris v. Rivera,* 454 U.S. 339, 346, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981). *Accord, Singletary v. United States,* 519 A.2d 701, 702 (D.C.1987) ("there is a presumption that a trial judge, in deciding a case, will disregard any inadmissible evidence and any improper argument"). The issue that Robinson raises is really whether recusal of a trial judge for bias may nonetheless be appropriate under some, presumably rare, circumstances where the judge has acquired relevant but inadmissible information from a prior proceeding. The general rule is that "[m]erely because a trial judge is familiar with a party and his legal difficulties through prior judicial hearings ... does not automatically or inferentially raise the issue of bias." *Matter of Evans,* 411 A.2d 984, 996 (D.C.1980) (quoting *Barry v. Sigler,* 373 F.2d 835, 836 (8th Cir.1967)). Any exceptions to this rule can only be based on the particular, necessarily egregious, facts and circumstances of a given case. *Evans,* 411 A.2d at 996.

 That brings us to this case. The concern that Robinson raises is purely hypothetical so far as he is concerned. Robinson does not claim that Judge Gardner (who, as mentioned in note 1, *supra,* was not sitting in the Domestic Violence Unit when this case was certified to him for trial) had received or considered inadmissible evidence from any source. Thus, there is not even arguably a due process violation in Robinson's case. We therefore have no occasion to address further the theoretical issue that Robinson would pose.

**C. Equal Protection**

Robinson's equal protection claim is one of gender discrimination in the "arrest policy" of the Metropolitan Police Department, the "prosecution policy" of the United States Attorney's Office, and the trial of criminal defendants in the Domestic Violence Unit. Robinson charges that "prejudice against men and the automatic assumption that men are violent guides the arrest, prosecution and trial of defendants in domestic violence cases."

**1. Robinson's Proffered Evidence of an Equal Protection Violation**

In support of his charges of selective prosecution and discrimination at trial, Robinson relies on certain statistics culled from Superior Court records and reported in a June 23, 1997, letter from the Clerk of the Court which Robinson proffered with his motions. According to the Clerk's letter, court records showed that a total of 2,192 persons were arrested for "domestic violence offenses"[16] since the inception of the Domestic Violence Unit. Of those 2,192 persons, 1,805 or 82% were men. The Clerk's letter states that the United States Attorney's Office "papered" (*i.e.,* we assume, charged by information or complaint) 70% of the cases against the men and 51% of the cases against the women. The Clerk reported that the Superior Court did not have conviction rates in domestic violence cases broken down by gender, but that the "the conviction rate for both sexes is 69%," almost entirely in bench trials.

In addition to these figures, Robinson proffered the affidavit of one David Pierce (not otherwise identified), in which Pierce

---

**16.** The letter does not disclose the type or types of crimes included within that category.

reported on his analysis of the criminal calendars of two Superior Court judges in the Domestic Violence Unit (neither of them Judge Gardner). One calendar covered the period February 26 to March 6, 1997, a total of seven days. The other calendar covered the period February 26 to March 17, 1997, a total of thirteen days.[17] The Pierce affidavit reports that a total of 84 cases on the two calendars were disposed of by trial, guilty plea or dismissal. In 75 of those cases (89%), the defendant was a man. In the sixteen cases on the two calendars that were resolved by trial, the one female defendant who went to trial was acquitted, while twelve of the fifteen male defendants (80%) who stood trial were convicted.[18] The government dismissed the charges against 25% (19 of 75) of the male defendants, and 44% (4 of 9) of the female defendants.[19]

Robinson concludes that the foregoing statistics "demonstrated gender disparity in the rate of arrest, 82% male to 17% female, in the papering rate, 70% for men and 30% [sic; presumably Robinson means 51%] for women, in the conviction rate at trial, 80% for men and 0% for women and in the rate at which the government enters a *nolle prosequi*, 25% for men and 44% for women." [20]

### 2. Discussion

■ To establish an equal protection violation entitling him to relief, Robinson must show "the existence of purposeful discrimination." *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (quoting *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967)). "Discriminatory purpose ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *McCleskey*, 481 U.S. at 298, 107 S.Ct. 1756 (internal quotations and citations omitted). In addition to showing the existence of improper motivation, Robinson must also show that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey*, 481 U.S. at 298, 107 S.Ct. 1756 (citing *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). In other words, Robinson has the burden of showing that "the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292, 107 S.Ct. 1756 (emphasis in the original).

■ These twin requirements of discriminatory purpose and effect are specifically applicable to Robinson's claims of selective arrest and prosecution. "The decision to prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' " *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)). Accordingly, to support his selective prosecution claims, Robinson must

---

17. Computer printouts of the criminal calendars were appended to Mr. Pierce's affidavit.

18. Ten cases were resolved by way of guilty plea (eight men, two women).

19. The court dismissed for want of prosecution the charges against 47% of the male defendants (35 of 75) and 22% of the female defendants (2 of 9). Thus, 72% of the male defendants (54 of 75) and 67% of the female defendants (6 of 9) had their cases dismissed one way or the other.

20. Robinson suggests that the higher rate of dismissals for want of prosecution for men merely "indicates that the government is willing to charge but [is] not prepared to go forward in cases involving men."

show that his prosecution in this case was motivated, at least in part, by his gender. In addition, to establish discriminatory effect, Robinson must make a prima facie showing that others similarly situated, *i.e.*, women who committed crimes of domestic violence, are generally not prosecuted. *See United States v. Armstrong*, 517 U.S. 456, 465–70, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *Fedorov v. United States*, 600 A.2d 370, 377–82 (D.C.1991). "[B]oth allegations must be clearly and separately established." *Id.* at 377.

This is a burden that Robinson has not carried in this case.

■■■ Robinson "offers no evidence specific to his own case that would support an inference that [gender] considerations played a part in his" arrest, prosecution or trial, and we perceive none. *McCleskey*, 481 U.S. at 292–93, 107 S.Ct. 1756. Robinson was charged and convicted for the gender-neutral and sufficient reason that Sergeant Fisher—Turner saw him attack Laura Payne after he exited their car. The evidence was sufficient to support Robinson's conviction and Robinson does not claim otherwise. Robinson's argument that he was discriminated against because Payne was not also arrested fails because Sergeant Fisher–Turner testified without contradiction that she had no grounds to arrest Payne. Although she saw Payne fighting with Robinson inside their car, Sergeant Fisher–Turner could not tell who started the struggle. She had no basis to think that the instigator was Payne; indeed, as the evidence appears to us, it is plausible to infer that Payne, who let go of the steering wheel and lost control of her car, was defending herself from Robinson.

Robinson also does not identify any court policy or practice, nor any law or law enforcement directive, that purports to treat men and women differently.[21] Administrative Order 96–25, which established the Domestic Violence Unit, is gender-neutral on its face, as are the statutes regarding intrafamily offenses and the particular offense of which Robinson was convicted. *See* D.C.Code §§ 16–1001 *et seq.* and 22–504. If anything, Robinson's claim of intentional discrimination against men is undercut by the fact that D.C.Code § 16–1031(a) makes it mandatory for a police officer to arrest any person, regardless of gender, whom the officer has probable cause to believe has committed a violent intrafamily offense. Thus, Robinson's reliance on such cases as *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), and *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), is unavailing, because those cases involved statutes which by their express terms discriminated between men and women. Robinson's claims of selective prosecution and unequal treatment are not based on a presumptively invalid, "overtly discriminatory classification." *Fedorov*, 600 A.2d at 381 (quoting *Wayte*, 470 U.S. at 608 n. 10, 105 S.Ct. 1524).

■■■ In lieu of direct proof of discriminatory purpose and effect in his case, Robinson offers statistics pertaining to arrest, prosecution, and conviction rates of men and women for domestic violence cases. Although statistics certainly may be valuable evidence of intentional discrimination in this as in other areas, "statistical proof normally must present a 'stark' pattern to be accepted as the sole proof" of intention-

---

**21.** Nor are we presented in this case with admissions on the part of police or prosecutors, for example, that they discriminate on the basis of gender in the prosecution of domestic violence. *Cf. Fedorov*, 600 A.2d at 382 n. 17 ("Courts have recognized that such admissions are powerful evidence in cases of alleged racial discrimination because few persons will admit to discriminating on the basis of race.").

al discrimination. *McCleskey,* 481 U.S. at 293, 107 S.Ct. 1756 (quoting *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). By a "stark" pattern, the Supreme Court in *McCleskey* and *Village of Arlington Heights* meant an extreme statistical disparity not reasonably susceptible, under all the circumstances, of a benign explanation.[22] *See, e.g., Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The Supreme Court has identified several reasons pertinent to the present case that make it difficult to establish intentional discrimination in decisions to arrest, prosecute, or convict criminal offenders by means of statistical evidence alone, even where there exist large statistical disparities. First, differences between groups in rates of arrest, prosecution, and conviction may reflect not discrimination, but actual differences in the frequency with which those groups commit different criminal offenses. So, for example, the Supreme Court has said that the presumption that people of all races commit all types of crime with the same frequency has "no proper place in the analysis of [the selective prosecution] issue" because it is "at war with presumably reliable statistics" to the contrary. *Armstrong,* 517 U.S.

at 469–70, 116 S.Ct. 1480. Second, decisions to arrest, prosecute, and convict are made by a myriad of independent actors— police officers, prosecutors, judges, and jurors. "It is incomparably more difficult to deduce a consistent [discriminatory] policy by studying the decisions of these many unique entities" than where a single decision maker or a unified decision making group is involved. *McCleskey,* 481 U.S. at 295 n. 15, 107 S.Ct. 1756. Third, as *McCleskey* itself demonstrates, even the most rigorous statistical analysis has a hard time capturing the nuanced and multifaceted quality of criminal justice decisions that "necessarily are individualized and involve infinite factual variations." *Id.* Further, "[b]ecause discretion is essential to the criminal justice process," especially in the decision whether or not to prosecute,[23] "exceptionally clear proof" of discriminatory motive is required to justify the inference that the discretion has been abused. *Id.* at 297, 107 S.Ct. 1756.

The statistics that Robinson proffers fall well short of satisfying the rigorous standard of a "stark" pattern amounting to proof of intentional discrimination. We need not catalog all the shortcomings in his data that we perceive.[24] Robinson's principal claim is that the arrest and papering rates he cites show that he was

---

**22.** Only in special contexts-notably, in jury selection and in employment discrimination-has the Court accepted somewhat less than extreme statistical inequalities as sufficient prima facie proof without additional evidence of discrimination. *See McCleskey,* 481 U.S. at 293–295 and 295 n. 14, 107 S.Ct. 1756.

**23.** "So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion." *Bordenkircher,* 434 U.S. at 364, 98 S.Ct. 663. "Courts are properly hesitant to examine the government's decision to prosecute because

that decision 'is particularly ill-suited to judicial review.'" *Fedorov,* 600 A.2d at 376 (quoting *Wayte,* 470 U.S. at 607, 105 S.Ct. 1524).

**24.** We merely note that Robinson has not subjected his raw data to anything like the kind of searching analysis that characterized the "sophisticated statistical studies" before the Supreme Court in *McCleskey,* in which the data took account of "230 variables that could have explained the disparities [in the imposition of the death penalty] on nonracial grounds." *McCleskey,* 481 U.S. at 286–87, 107 S.Ct. 1756.

selectively prosecuted on the basis of his gender. Even if we accept those rates at face value, they prove neither discriminatory purpose nor discriminatory effect, for Robinson has presented no substantial evidence of a failure to arrest or prosecute women who are similarly situated when it comes to the commission of domestic violence offenses. That more men than women are charged with such offenses may be attributable, for example, to the fact that more men commit such offenses, or that men commit such offenses more frequently, or that men commit serious forms of violence more often than women, or that women report being victimized by domestic violence more frequently than men.

As the government points out, there is considerable support for the proposition that domestic violence crimes are disproportionately committed by men. The government cites, *inter alia*, UNITED STATES DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, VIOLENCE BY INTIMATES: ANALYSIS OF DATA ON CRIMES BY CURRENT OR FORMER SPOUSES, BOYFRIENDS, AND GIRLFRIENDS 13 (1998) (from 1992 to 1996, the rate of victimization by an "intimate"—a spouse or ex-spouse or a current or former boyfriend or girlfriend—was about five times

as great for women as for men) and VIOLENCE AND THE FAMILY: REPORT OF THE AMERICAN PSYCHOLOGICAL ASSOCIATION PRESIDENTIAL TASK FORCE ON VIOLENCE IN THE FAMILY 9 (1996) (noting that majority of adult victims of family violence are women and majority of victimizers are men). Robinson cites a single study that concluded contrarily that women initiate physical violence "about as often" as men. M.A. STRAUS & R.J. GELLES, PHYSICAL VIOLENCE IN AMERICAN FAMILIES 155 (1990). The government dismisses this study as methodologically suspect and its conclusion as unreliable.[25] Be that as it may, the study is not specific enough to establish that similarly situated women in the District of Columbia could have been charged with domestic violence offenses but were not.[26] *Cf. Armstrong*, 517 U.S. at 469, 116 S.Ct. 1480 (proffered study of racial disparities failed to establish colorable basis for a selective prosecution claim where defendant failed to "produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not").[27]

Robinson's remaining claim, that conviction rates after trial in the Domestic Vio-

25. Based on a national telephone survey in which respondents were asked if they had engaged in at least one of certain listed behaviors, such as pushing, shoving, slapping, beating up, choking, or threatening with or using a knife or gun, the Straus & Gelles study concluded that women and men are equally violent in couple relationships. The government points out that a comprehensive review report issued by the American Psychological Association challenged the validity of this conclusion in view of methodological weaknesses in the survey and data indicating that men perpetrate more frequent, more severe, and more injurious aggressive actions against their female partners than women do against their male partners. *See* MARY P. KOSS ET AL., NO SAFE HAVEN: MALE VIOLENCE AGAINST WOMEN AT HOME, AT WORK, AND IN THE COMMUNITY 58–59, 64–65 (1994).

26. We do not expound in the abstract on the kind of study that might constitute sufficient evidence of gender-based differences in the arrest and prosecution of similarly situated men and women.

27. Additionally, we think that no inference of intentional discrimination can be drawn from the relatively small disparity (25% to 44%) that Robinson points to in the rates at which the government dismissed a very small number of men's and women's cases during a one to two week period in 1997. This sample is not statistically meaningful, for one reason because the numbers involved are too small (e.g., there were only nine female defendants).

lence Unit show that he was discriminated against because he is a man, fails if only because of the utter sparsity of the data that Robinson presents. It is not possible to draw any inferences of discrimination from the bare results of only sixteen bench trials.[28] The simple fact that the one woman tried was acquitted, while three of fifteen men tried were acquitted and the remainder convicted, is meaningless.

There is no reason for us to belabor the point. Robinson has not made even a threshold showing of gender-based selective prosecution or any other equal protection violation.

### III.

As we conclude that the Domestic Violence Unit did not lack jurisdiction over Robinson's case, and that he has not shown a constitutional violation, we affirm his conviction and the order of the trial court denying his motion for post-conviction relief.

*So ordered.*

---

**28.** It is, moreover, patently illogical to argue that Judge Gardner discriminated against Robinson based on evidence of how two other Superior Court judges ruled in unrelated cases.