917 A.2d 86 (2007)
In re B.J., Br.J. and E.J., L.J., Appellant.
Nos. 05-FS-339, 05-FS-1582, 05-FS-1583.
District of Columbia Court of Appeals.
Submitted November 21, 2006.
Decided February 15, 2007.
*88 Carla S. Rappaport, appointed by the court, was on the brief for appellant.
Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, Edward E. Schwab, Deputy Solicitor General, and Stacy L. Anderson, Assistant Attorney General, were on the brief, for the District of Columbia.
Lawrence H. Huebner, guardian ad litem for B.J., Br.J., and E.J., filed a statement in lieu of brief.
Before FISHER and THOMPSON, Associate Judges, and NEBEKER, Senior Judge.
THOMPSON, Associate Judge:
L.J., the biological mother of E.J., B.J., and Br.J., challenges the order of the Superior Court Family Division terminating her parental rights with respect to the three children. She argues that service of process on her relating to the termination of parental rights ("TPR") action was defective. She also argues that the trial court abused its discretion by not hearing testimony from E.J., the oldest of the three children, about what he believed was in his best interests, and by failing to give adequate weight to appellant's choice of a caretaker for B.J. and Br.J.
"We review the trial court's legal determinations de novo and its findings of fact under a clearly erroneous standard." In re A.C.G., 894 A.2d 436, 439 (D.C.2006). We find no error and therefore affirm the TPR order.

I. Factual and Procedural History
The government filed its motion to terminate appellant's parental rights with respect to E.J., B.J., and Br.J. on January 23, 2004.[1] According to the petition, the District of Columbia Child and Family Services Agency ("CFSA") discovered that on September 29, 1997, appellant had abandoned E.J. (born on September 1, 1992) and B.J. (born on January 6, 1997) in the front yard of the home of appellant's maternal cousin Le.J. Le.J. informed CFSA that she was already caring for three children with TANF (Temporary Assistance for Needy Families) assistance and could not care for E.J. and B.J. without additional assistance. Thereafter, on October 11, 1997, CFSA filed a neglect petition.
After the commencement of neglect proceedings, E.J. and B.J. were placed under protective supervision in appellant's home. See D.C.Code § 16-2301(19) (1981). On October 2, 1998, CFSA learned that appellant had left E.J., B.J. and Br.J. (born on April 19, 1998) alone with L.J.'s minor sibling. Protective supervision was terminated, and E.J., B.J. and Br.J. were removed from appellant's care for lack of proper parental care and supervision. Appellant stipulated that she could not provide proper care for the three children, in part because of her abuse of crack cocaine. All three children were placed into foster care.
After attempting to reunify the family, CFSA concluded that reunification was not a viable option and that it was in the children's best interests to have appellant's parental rights terminated to help facilitate adoption. In initiating TPR proceedings, CFSA alleged that appellant visited *89 her children only sporadically, failed consistently to attend drug abuse treatment, and remained in contact with an abusive partner. When appellant appeared for a status hearing in the neglect case, the courtroom clerk served her with the TPR petition. Thereafter the court held a bench trial on the TPR petition over a several-day period during October, November and December 2004.
At the conclusion of the TPR hearing, Magistrate Judge John McCabe found, in a December 16, 2004 order, that "overwhelming evidence was presented that supports termination of parental rights in this case." He found that over the seven-year period before the TPR hearing, appellant had continuously evaded the completion of drug treatment programs, parenting classes, and counseling for coping with domestic violence. He noted that four other of appellant's children had been removed from her home on January 16, 2003, following appellant's absence from the home due to an admitted drug binge.[2] He also noted that appellant had tested positive for cocaine during the time of the TPR proceedings, and concluded that appellant remained "at high risk for continued illegal drug use." Judge McCabe noted that appellant had failed to attend multiple days of the eleven-day hearing, and that when she did appear, she exhibited "immaturity and a significantly low frustation tolerance, revealed through verbal reactions (audible to the Court) and physical reactions to the testimony of witnesses."
Judge McCabe further noted that after B.J., E.J., and Br.J. were placed into foster care, appellant's visitation with them was spotty at best, despite the fact that visitation was available through social workers. At times appellant did not request visitation at all, while at other times she would schedule visitation and then fail to appear at the designated time and place. Long periods existed during which appellant made no contact with the children at all.
Judge McCabe noted in his findings that B.J. and Br.J. had a warm and loving nearly-three-year bond with their foster parents, and that E.J. had a similar bond with his foster parent, with whom he had resided for close to two and a half years. He noted that because of B.J.'s and Br.J.'s young ages, neither child expressed detailed views on their best interests, and that there was no evidence that the two youngest children had expressed any desire for a closer relationship with their mother. Judge McCabe acknowledged E.J.'s expressed interest in reunification with his mother, but found that it was in E.J.'s best interests not to reside with appellant because of her continuous problems with drug abuse and domestic violence.
Judge McCabe considered appellant's cousin, Le.J., as a possible permanent placement for B.J. and Br.J. Although noting that Le.J. had testified during the hearing that she would consider adopting or filing for guardianship of B.J. and Br.J., Judge McCabe found that placement with her would not be in the best interests of the children because it would likely mean that the children would have regular contact with appellant, creating a substantial risk that they would be exposed to drug abuse, domestic violence, and the general emotional instability overshadowing appellant's life. Judge McCabe also noted that *90 there were no other family members with whom the children had a substantial bond.
Appellant timely filed a motion for reconsideration of Judge McCabe's order terminating her parental rights. The Honorable Kaye K. Christian reviewed Judge McCabe's Findings of Fact and Conclusions of Law and Order Terminating Parental Rights and, on February 23, 2005, affirmed the order in all respects. It is from Judge Christian's February 23, 2005 order that L.J. appeals.

II. Analysis

A. Service of Process
While acknowledging that the courtroom clerk personally served her in open court during a status hearing in the neglect case, appellant contends, without citing any authority, that this manner of service of process in connection with the TPR proceeding was contrary to public policy and should be rejected as deficient, rendering the TPR proceedings void. This argument is without merit.[3]
First, the Superior Court rules of procedure clearly are broad enough to permit service of process by a courtroom clerk within a courtroom, as happened here. Superior Court Neglect Rule 36(d) states that "[u]pon filing of the [TPR] motion, the Clerk shall issue a summons, pursuant to Rule 11, and the movant shall cause the summons and a copy of the motion to be served on the parents." Superior Court Neglect Rule 11(e) permits a summons to be served "by any person empowered to serve a summons in a civil action," who, pursuant to Superior Court Civil Rule 4(c)(2) may be "any person who is not a party and who is at least 18 years of age." Finally, Superior Court Neglect Rule 11(j) states that, "oral notification given by a judicial officer during a hearing to any person present or written notification given in person by an authorized representative of the Court shall constitute legal notice in lieu of service."
Appellant asserts, however, that a policy permitting a party to be served while she is appearing in court on another matter is contrary to public policy because it may have a chilling effect. That is, permitting service in this manner may discourage parties from attending court proceedings out of fear that they may be served with process in another matter. Appellant's argument reflects the longstanding principle, recognized by courts in this jurisdiction, that "parties and witnesses attending any legal tribunal in good faith are privileged from service of civil process or arrest under such process during their attendance and for a reasonable time in going and returning." Cooper v. United States, 48 A.2d 771, 773 (D.C. 1946)[4]; see also Lamb v. Schmitt, 285 U.S. *91 222, 225, 52 S.Ct. 317, 76 L.Ed. 720 (1932) (noting that the rule is "the privilege of the court, rather than of the defendant," and that it "proceeds upon the ground that the due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation" (internal quotation and citation omitted)); Engle v. Manchester, 46 App. D.C. 220, 229 (1917) (explaining that an additional reason for the rule is that "[n]o one should be deterred from attending the place of trial by reason of liability to be sued in a foreign or distant jurisdiction.").
There is, however, an exception to the principle described above, applicable where the subject matter of the court proceeding is closely related by subject matter to the action in which service of process is being made. See Lamb, 285 U.S. at 226, 52 S.Ct. 317 (noting that the exception applies where "one who, while in attendance, is served with process commanding his continued presence and aid to facilitate the pending litigation, and to carry it to its final conclusion.").[5] Here, the courtroom clerk served appellant with a summons and a copy of the government's motion to terminate appellant's parental rights with respect to E.J., B.J., and Br. J. while appellant was appearing in the related neglect proceedings involving the same three children. We hold that appellant's involvement as the biological mother in both the neglect and TPR proceedings, which involved common issues of neglect, overrode any immunity to in-court service of process that appellant might otherwise have enjoyed. Sadly, the TPR proceedings were the "final conclusion," id., to the neglect proceedings.

*92 B. Failure to Hear From E.J.
Appellant next argues that the court abused its discretion in affirming the TPR order where the trial court failed to hear directly from E.J., who was nearly twelve years old at the time of the TPR hearing.[6] Appellant contends that the court's hearing from E.J. would have added to the weight of testimony by E.J.'s therapist, Mr. Bazemore, that reunificiation with appellant was a conceivable goal for E.J., and would have countered the testimony of other experts, including that of Dr. Missar, who testified that E.J.'s desire for reunification with appellant was based on unrealistic expectations of L.J.'s ability to provide care for him.
The court was required, under D.C.Code § 16-2353(b)(4), to consider, "to the extent feasible," E.J.'s opinion about his own best interests. However, while "it is preferable for judges to hear directly from the children involved in such proceedings if it is at all feasible to do so," In re J.L., 884 A.2d 1072,1080 (D.C.2005) (internal citation and quotation omitted), "[t]he statute does not say the judge must derive this opinion even partly from questioning of the child" himself. In re T.W., 623 A.2d 116, 117 (D.C.1993); see also In re I.B., 631 A.2d 1225, 1232 (D.C.1993). Thus, as appellant acknowledges, the trial court had no per se duty to ascertain E.J.'s opinion through the child's direct testimony or statements. As we noted in T.W., "common sense suggests that in many cases the most probative evidence of the child's opinion may lie in statements the child has made to others such as psychologists or in the child's past behavior, rather than in testimony given in the formal surroundings of a court proceeding." 623 A.2d at 117.
As Judge Christian noted, there was testimony from social workers, therapists and foster parents, which the trial court credited, from which the court could ascertain E.J.'s opinion as to his best interests. Judge Christian took note of the trial court's statements recognizing that E.J.'s opinion "carries more weight than that of a much younger child," and that "E.J. has expressed an interest in reunification with his mother." Further, Judge Christian noted that during the TPR hearing, appellant never requested E.J. to testify.
We note that Judge McCabe recognized explicitly that E.J. "harbors hopes of a happy home life with his mother" and was "particularly anxious about the situation because he knows that his two older siblings are now living with [appellant]." At the same time, Judge McCabe took into account testimony from a social worker that indicated that E.J.'s interest in reunification with appellant was "secondary to his interest in staying with [his foster mother]." Judge McCabe observed that "[a]ccording to [a social service worker who testified at trial,] E.J. said that if he was unable to stay with [his foster mother], *93 th[e]n he would like to go with his mother."
The trial court weighed E.J.'s views against evidence that appellant had been "unable to even commit herself to regularly visiting E.J. throughout this case" and unable during the seven-year history of the case "to adequately address her drug addiction or to maintain a household free of domestic violence." The court also noted that Dr. Bazemore, who "may not have been aware of the extent of [appellant's] history of drug, mental health, domestic violence, and other problems," himself had observed the "detrimental emotional impact on [E.J.] of [appellant's] repeated failures to consistently maintain contact with him."[7] The court found that appellant did not have the ability to meet E.J.'s needs and that, despite E.J.'s expressed wishes, it would be in E.J.'s best interests to have appellant's parental rights terminated, because "further attempts to encourage contact between E.J. and [the appellant] will inevitably lead to additional disappointment and emotional trauma to him."
On this record, we agree with Judge Christian that "it was not an abuse of discretion or an error in law for the Magistrate Judge to not take testimony from [the children] given the ages of the [children], the potentially feckless testimony that would have been elicited . . . and the volume of testimony from other witnesses as to the best interests of the [children]."[8]

C. Consideration of L.J.'s Preference As to Placement
Finally, appellant contends that the trial court failed to give weighty consideration to her preference of a relative placement for B.J. and Br.J. Appellant relies on our decisions recognizing that the availability of a fit family member willing to assume legal custody of the child is an important consideration in the court's decision whether to terminate the parent-child relationship, see In re Baby Girl D.S., 600 A.2d 71, 83-84 (D.C.1991), and In re C.T., 724 A.2d 590, 598 (D.C.1999); and that "`a parent's choice of a fit custodian must be given weighty consideration that can be overcome only by a showing, by clear and convincing evidence, that the custodial arrangement and preservation of the parent-child relationship is clearly contrary to the child's best interest.'" In re F.N.B., 706 A.2d 28, 31 (D.C.1998) (quoting In re T.J., 666 A.2d 1, 11 (D.C.1995)).
While we have applied these principles even in cases involving termination of parental rights for neglect, see, e.g., FNB, 706 A.2d at 29-31, we have also said that "a biological parent's choice of related caretakers should not be afforded the same weighty consideration where the neglected child had been in the custody of *94 foster care for a considerable length of time before the biological parent demonstrated any interest in exploring possible familial placement options." In re A.T.A., 910 A.2d 293, 297 n. 4 (D.C.2006) (citing In re An.C., 722 A.2d 36, 40-41 (D.C.1998)). In In re An.C., we applied that rule where  similar to the facts here  the neglected children had lived with their foster mother for more than two years before the biological parents suggested that the children should be placed with a relative. 722 A.2d at 40.
We agree with Judge Christian that the trial judge carefully considered whether placement with Le.J. would be in the best interests of B.J. and Br.J., and we are satisfied that, however weighty the consideration to be given to L.J.'s desire that Le.J. be permitted to care for B.J. and Br.J., there was ample evidence that placement with Le.J. would not have been in the children's best interests. Judge Christian referred to the trial court's observations that at the time of the TPR hearing, B.J. and Br.J. had been in foster care for six years and that, during those years, Le.J. took no steps to take custody of the children. As the trial court found and Judge Christian repeated, "the presentation of Le.J. at this late date appears to be an attempt by [appellant] to prevent a TPR rather than the suggestion of a placement that would be in the best interests of [B.J. and Br.J.]." Judge Christian also noted the trial court's finding that Stephanie Gittinger, the children's social worker at the time of the TPR proceeding, testified that she had identified Le.J. as a potential placement, but after speaking with Le.J., found her to be palpably hesitant about being the sole primary care-giver of two more children when, as a single mother, she was already caring for two children of her own (including a special needs child) and one of appellant's other children. Most important in our view, Judge Christian relied on the trial judge's findings that "placement with [Le.J.] would likely mean regular contact by [appellant] with B.J. and Br.J., and this contact presents the substantial risk of exposure to the harmful impact of drug abuse, domestic violence, and general emotional instability that are unfortunately a constant presence in their mother's life," and that "[p]lacement with a non-relative is clearly in the best interests of the children since they do not at this time have a substantial bond with any family members."
Just as we concluded in In re An.C., we conclude here that although appellant's wishes as to the custody of her children appropriately were an important factor in the judge's calculus, "the TPR judge could rationally find, and [he] did find, that in this case the [mother's] statement of preference came far too late, that the proposed alternative placement [was] unrealistic, and that further delay would be detrimental to the children's well-being." 722 A.2d at 41.
For the foregoing reasons, we affirm the order terminating L.J.'s parental rights with respect to E.J., B.J. and Br.J. and denying L.J.'s request that B.J. and Br.J. be placed with Le.J.
So ordered.
NOTES
[1] The petition also prayed for termination of the parental rights of the natural fathers of all three children. After the petition was granted, none of the fathers appealed to this court.
[2] The TPR petition indicated that those four children and appellant's sister were all removed from appellant's home in 2003. Appellant stipulated on March 19, 2003 that she had a substance abuse problem that made her unable to provide proper care for them, and they were all adjudicated neglected.
[3] We treat an allegation that service of process was inadequate as an allegation that the court lacked jurisdiction to hold the proceeding in issue. See, e.g., Parker v. Frank Emmet Real Estate, 451 A.2d 62, 66 (D.C.1982). We review de novo questions concerning a trial court's jurisdiction. See In re J.W., 837 A.2d 40, 44 (D.C.2003).

Appellee District of Columbia argues that L.J. waived her service of process argument by failing to make a specific objection to the manner of service earlier, by motion or answer. Choosing to address the service of process argument on its merits, we decline to decide whether the issue was raised adequately in appellant's trial court pleadings.
[4] There is also a statutory provision, codified at D.C.Code § 23-1504, that protects "[a]ny person who comes into the District of Columbia in obedience to a summons directing him to attend and testify" from "service of process, civil or criminal, in connection with any matter which arose before his entrance into the District of Columbia under the summons." See also D.C.Code § 23-1501(3) (defining "summons" to include a subpoena, order, or other notice requiring the appearance of a witness). Because the record contains evidence that L.J. did not reside in the District of Columbia for at least some portion of the time period pertinent to this appeal, we have considered whether this statute applied to prohibit service of the TPR summons on her while she was in court on March 31, 2004 attending proceedings in the neglect case. We conclude that the statute was not applicable. Even assuming that L.J. resided outside the District on March 31, 2004, we see nothing in the record that indicates that L.J. was present in court on that day pursuant to a subpoena, order, or other notice directing her to attend and testify.
[5] This exception "is founded upon the convenience of the court itself." H.C. Lind, Annotation, Immunity From Service of Process as Affected By Relationship Between Subject Matters of Litigation in Which Process Was Issued, and Litigation Which Nonresident Served Was Attending, 84 A.L.R.2d 421, § 2, at 423 (2004).

As the government points out, our opinion in Robinson v. United States, 769 A.2d 747 (D.C.2001), makes reference to a Superior Court administrative order instructing courtroom clerks to serve defendants attending arraignments for domestic violence misdemeanors with temporary protection orders, petitions for civil protection orders, paternity and child support petitions, and other related papers. See id. at 751 n. 6; see also In re Dixon, 853 A.2d 708, 711 (D.C.2004) (serving a civil protection order in open court); Hector v. United States, 883 A.2d 129, 130 n. 3 (D.C.2005) (referring to Superior Court Civil Protection Order form that contains a check box in which to state whether the defendant was or was not served in open court.) This practice appears to be consistent with the exception described above. Other jurisdictions have a similar practice. See, e.g., Lamb, 285 U.S. at 226, 52 S.Ct. 317 (allowing service of process for contempt while in open court); State ex rel. S.F., 802 So.2d 791, 793 (La.App. 2001) (mother was served with a TPR petition in open court during a neglect proceeding); In re Brett R., 343 Ill.App.3d 1210, 279 Ill.Dec. 108, 799 N.E.2d 911, 913-14 (2003) (father was served with neglect petition in open court during appearance in a TPR proceeding).
[6] Although appellant's brief suggests that the trial court should have heard from all three children, appellant's primary contention is that the trial court should have heard from E.J., who had expressed a desire to be reunified with his mother. In any event, as noted above, the court found that the two younger children "do not often talk about [their biological parents] unless prompted to do so through questions," that there was no evidence that they had ever expressed a desire for a closer relationship with their parents, and that they had lived with their mother for only a very small portion of their lives. The record provides ample basis for Judge Christian's finding that "if testimony had been elicited from [B.J and Br. J], the testimony would have been . . . referring to reunification with a `hypothetical mother' rather than [L.J.]." February 23, 2005 order at 6 (quoting In re A.R., 679 A.2d 470, 477 (D.C.1996)).
[7] Appellant's brief refers at some length to testimony by Mr. Bazemore about the "instant rapport" between E.J. and appellant, and to Mr. Bazemore's view that visits with appellant had been beneficial in helping to ease E.J.'s feelings of abandonment and rejection. Judge McCabe's observations regarding Mr. Bazemore's limited information about L.J.'s history of drug, mental health and domestic violence problems satisfactorily explain why the court rejected Mr. Bazemore's recommendation against termination of the parent-child relationship.
[8] We note, moreover, that the children's guardian ad litem stated in his closing argument to the trial court that he believed that E.J. had a "fascination with his mother, an unrealistic view of his mother. . . . This is not healthy for E. This is not allowing E. to move on. . . . [T]he granting of a termination of parental rights would allow E. to deal with his mother; deal with this view. It would be a short-term trauma for him, but in the long run, it would make him emotionally available to recover and move on with his life, either to stay with [his foster mother] or go to an adoptive home."